IN THE

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


SONNY I. SZETO


V.                                      NO: 3:06CR55(JCH)


UNITED STATES OF AMERICA



<u>MOTION PURSUANT TO</u>

<u>FEDERAL RULES OF CIV. PROCEDURE</u>

<u>60(b)</u>



SONNY I. SZETO

PRO SE

FILED

2013 FEB 13 A 9:46

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

# INTRODUCTION

The case of Sonny Szeto involves a young man who due to a confluence of psychiatric, physical and environmental conditions predisposed him to the offense to which he was convicted.

In 2006, Robert Lloyd Goldstein, MD; a Clinical Professor of Psychiatry and Director of the "Legal Issues in the Practice of Psychiatry" Course at Columbia University's College of Physicians and Surgeons, had rendered his recommendations as to what would be the best course for returning the defendant to a productive member of society. "In my professional opinion, Sonny's psychiatric condition substantially contributed to his conduct in the instant offense and should be taken into account as an important factor weighing his culpability.

Incarceration is likely to exacerbate his clinical depression and derail his attempts to return to a constructive social and occupational adjustment. Incarceration would also deprive him of the opportunity to continue intensive therapy in the specialized sex offender treatment program he is not attending. Such specialized psychological services would not be available in the correctional setting. The optimum disposition in this case would involve probationary supervision, continuing psychotherapy supervision in the sex offender treatment program. And the opportunity to resume using computers in his constructive occupational endeavors."


(Excerpted from Goldstein Opinion)

This in addition to scientific evidence brought forth in a case with many similar personal characteristics has demonstrated that due to the process and proceedings employed by two different Courts in the same Circuit, caused a sentencing disparity so great, it amounts to denial of Due Process, Equal Protection under the Law and subjected Sonny Szeto to Cruel and Unusual Punishment.

The question is; would the public viewing these two cases inclusive of "relative conduct" and "totality of the circumstances" understand the reasoning behind a

sentencing disparity of more than <u>ten years</u>?

Rule 60(b)

Pursuant to Rule 60(b), a Court may relieve a party from final judgment on the following grounds:

1.)  Mistake, inadvertance, surprise or excusable neglect;

2.)  Newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new Trial under rule 59(b).; fraud... misrepresentation, or misconduct by an opposing party;

3.)  The judgment is void;

4.)  The judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

5.)  any other reason that justifies relief.  Fed R. C. V. p 60(b). "Rule 60(b), like the rest of the rules of civil procedure applies in Habeas Corpus proceedings...only "to the extent that [it is] not consistent with applicable federal statutory provisions and rules." <u>Gonzales v Crosby</u>, 545 US 524, 529, 125 S.Ct. 2641, 162 L. Ed. 2d 480 (2005) (Citing 28 USC Section 2254 (Rule 11) as the Supreme Court has recognized, there exists "friction between [Rule 60(b) and the successive petition prohibitions of AEDPA [the antiterrorism and effective death penalty act]" Id at 534-35 accordingly, only those claims challenging some defect in the integrity of the Federal Habeas proceedings, "may be the proper subset of a Rule 60(b) motion in a Habeas proceeding. Id at 532; see also <u>Harris v United States</u>, 367 F. 3d 74, 77 (2d Cir 2004) (Holding that relief under Rule 60(b) is available in a Habeas proceeding only when the motion attacks the integrity of the previous Habeas proceeding).

## NEW EVIDENCE

Where one of the strongest points for vacating and resentencing Sonny Szeto

lies, is in the psychological evidence provided in another District Court case

in the Second Circuit. And though the cases were adjudicated almost four (4)

years apart, as in any offense that has roots in science or medicine, advances

and changing points of view are occurring constantly and should be taken into

consideration. It is this empirical evidence that allows the public to have confidence

that our justice system is fair and equal.

The sentencing hearing of Mr. Szeto and C.R. again show a stark difference

in the examination of the defendants. Mr. Szeto's sentencing hearing consisted

of haggling over sentencing enhancements and the validity of an opinion provided

by a psychiatrist, Dr. Goldstein. Barely mentioned was the defendant himself

and any mitigating factors.

In C.R. a detailed examination of the defedant's history was brought forth

in Court and what was considered best for society as well as the defendant was

considered.

Part of the mitigating scientific evidence that Dr. Goldstein's opinion alludes

to can be found in the C.R. opinion by Judge Weinstein:

> "Drawing the line at 18 years of age is subject... to the objections... against
> catagorical rules." Id at 574. "The qualities that distinguish juveniles
> from adults do not disappear when an individual turns 18." Id. While 18 may
> be the "Point where society draws the line for many purposes between childhood
> and adulthood, scientific developments conclude that full adulthood is not
> biologically obtained until much later in life than 18. Id. The American
> Psychological Association explains that differences between adolescents and
> adults with respect to "risk taking, planning, inhibiting impulses, and generating
> alternatives" is connected to "adolescent behavioral immaturity: the human
> brain does not settle into its mature, adult form until after the adolescent
> years have passed and a person has entered into young adulthood." Brief for
> the American Psychological Association and the Missouri Psychological Association
> as Amici Curiae Supporting respondent at 9, Roper v Simmons, 543 US 551,
> 125 S.Ct. 1183, 161 L. Ed. 2d (2005) (No. 03-633), 2004 WL 1636447 at *9
> (herinafter Roper APA Brief)

> Deciding where to draw the chronological age boundary between adolescence
> and adulthood for purposes of justice policy is a more complex challenge

than setting the minimum age of juvenile court jurisdiction because several concerns are important but may not point in the same direction. The first is psychological development; the line should be drawn with attention to the process of maturation, ideally shielding immature youths from adult prosecution and punishment while holding mature individuals fully accountable. This factor turns out to be somewhat complex, however, because as we have explained the relevant psychological abilities and capacities do not develop in lock step fashion, but progress at different rates. Thus, logical reasoning and information processing capacities that are most relevant to competence to stand trial mature thru a pre-adolescence and early adolescence, reaching adult levels around age fifteen or sixteen. In contrast, psychological capacities that influence involvement in criminal activity, such as impulse control, future orientation, or resistance to peer influence (as well as the regions of the brain that regulate these phenomenon), mature primarily in middle adolescence, continuing into late adolescence, and even into early adulthood... Thus a jurisdictional boundary separating minors from adults based on studies of logical reasoning and basic cognitive abilities would classify adolescent as adults at a younger age than a boundary based on research on psychological development or brain maturation. Beyond this, there is a great deal of individual variation in maturation rates; some youths are adultlike at age 15, while others are still immature in early adulthood. Adolescence and adulthood are not tidy developmental catagories; the transition to adulthood is a gradual process. The upshot is that science does not dictate any specific age as the appropriate threshold for adult adjudication and punishment. Elizabeth Scott & Laurence Stenberg, Rethinking Juvenile Justice 236 (2008); see also Emily Buss, What the Law School Should (and Should Not) Learn from Child Development Research, 38 Hofstra L. Rev 13, 39 (2009) ("Much of the developmental research suggests that the qualities highlighted by the Court [in Roper Simmons], described together as psycho-social immaturity, continue to apply to individuals into their twenties, even mid twenties and beyond.")

Scott and Steinberg acknowledge that while the marker for adjudication is age eighteen, this line drawing is based on policy about which the author claims no expertise rather than science. "Although studies of brain development indicate that continued maturation takes place at least twenty-five or so, policy makers would not likely endorse treating individuals who offend in their early twenties as juveniles..." Id. at 238.

Scientific studies on adolescent behavior concludes that adolescents are less able than adults to voluntarily control their behavior. "Relative to individuals at other ages...adolescents...exhibit a disproportionate amount of reckless behavior, sensation seeking and risk taking." Linda Patia Spear, The Adolescent Brain and Age-Related Behavioral Manifestations, 24 NeuroScience and Behavioral Reviews 417, 421 (2000). Sensation seeking is a normal part of adolescent development, so much so that "it is statistically aberrent to refrain from such [risk taking] behavior during adolescence." Id at 421.

These difference between adolescent and adult behavior are a result of "psychological limitations in [adolescents'] ability to consistently and reliably control their behavior." Graham AMA brief at 6, (citing Elizabeth Cauffman & Laurence Steinberg, (im) Maturity of Judgment in Adolescence: Why Adolescents May be Less Culpable than Adults, 18 Behav. Sci & L. 741, 742 (2000); William Gardner, A Life-Span Rational Choice Theory of Risk Taking in Adolescent and Adult Risk Taking: The Eighth Texas Tech Sumposium on Interfaces in Psychology 66, 67 (N.Bell & R.Bell eds., 1993).

One of the principle ways this reduced capacity to control behavior is expressed by adolescents' difficulty with impulse control. "A cornerstone of cognitive development is the ability to suppress inappropriate thoughts and actions in favor of goal directed ones, especially in the presence of compelling incentives." B.J. Casey et al., The Adolescent Brain, 28 Developmental Rev. 62, 64 (2009). Numerous studies document the limitations on adolescents' limited ability to control their impulses. See, eg., Casey Supra at 64 ("A number of classic developmental studies have shown that this ability develops throughout childhood and adolescence."); Laurence Steinberg, Adolescent Development and Juvenile Justice, 2009 Ann. Rev. Clinical Psychol. at 47, 58 (2009). ("[I]ndividuals become more resistant to peer influence and oriented to the future, and less drawn to immediate rewards and impulses, as they mature from adolescence to adulthood."); Laurence Steinberg et al., Age Difference in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual System Model, 44 Developmental Psych. 1764 (2008) (self-report and performance measure on test show "a linear decline in impulsivity between the ages of 10 and 30").

Structural differences between adolescent and adult brains, confirmed by recently developed brain imagery technology, demonstrates that critical regions of the brain responsible for controlling thoughts, emotions, impulsivity, and actions continue to develop through age 25. See Graham AMA Brief at 13-31. "Developmental neuroscience has not gathered extensive evidence that both the structure of the adolescent brain, and the way it functions, are immature compared to the adult brain." Id at 13. Brain imaging has allowed scientists to better understand the relationship between "the dramatic maturation of cognitive, emotion, and social functions with the brain structures that ultimately underlie them." Elizabeth R. Sowell et al. Mapping Cortical Changes Across the Human Life Span, 6 Nature Neurosco. 309 (2003). These studies have revealed two complementary observations. "First, the parts of the brain that work together to support the control of behavior, including the prefrontal cortex (which compromises roughly the front third of the human brain), continue to mature even through late adolescence. Second, in making behavioral choices, adolescents rely more heavily than adults on systems and areas of the brain the promote risk taking and sensation seeking behavior." Graham AMA Brief at 15 (citing Casey, Supra, at 68).

Magnetic Resonance Imaging (MRI) technology allows for "Mapping of brain anatomy and observations of brain functioning while an individual performs tasks involving speech, perception, reasoning and decision making." Roper APA Brief at 9. The frontal lobes of the brain, and in particular the pre-frontal cortex, "play a critical role in the executive functions of the brain." Id. at 9-10 (citing Elkhonon Goldberg, The Executive Brain: Frontal Lobes and the Civilized Mind 23 (2001). The prefrontal cortex is responsible for a variety of "executive functions" such as "response inhibition, emotional regulation, planning and organization." See Elizabeth R. Sowell et al., In Vivo Evidence for Post Adolescent Brain Maturation in Frontal and Striatal Regions, 2 Nature Neusci. 859, 860 (1999); see also Graham AMA Brief at 16, n. 39, citing numerous studies. This region of the brain is also responsible for several cognitive abilities including "risk assessment," "evaluation of reward and punishment," and "impulse control." See Graham AMA Brief at 16-17 & n. 40-44. Other functions of the prefrontal cortex include "decision-making," "the ability to judge and evaluate future consequences," "recognizing deception," "response to positive and negative feedback," "working memory," and "making moral judgments." See Graham AMA Brief at 17 and n. 45-50.

"The brain's frontal lobes are still structurally immature well into late

adolescence." Graham AMA Brief at 18 (citing Nitin Gogtay, et al., Dynamic Mapping of Human Critical Development During Childhood through Early Adulthood, 101 Proc. of the Nat'l Acad. of Sci. 8174 (2004) (studying subjects aged 4-21)). "[O]ne of the last brain regions to mature "is the prefrontal cortex, the area of the brain responsible for a variety of cognitive and executive functions. See B.J. Casey et al., Structural and Functional Brain Development and its Relation to Cognitive Development, 54 Biological Psychol. 241, 243 (2000); see also Gogtay, supra at 8177 ("parts of the brain associated with more basic functions matured early... Later to mature were areas involved in executive function, attention, and more coordination (frontal lobes).").

Immaturity can be analogized to dysfunction or disruption. "Disruption of functions associated with the frontal lobes may lead to impairments in foresight, strategic thinking and risk management." See Roper ABA Brief at *10, (citing M. Marsel Mesulam ed. 2d ed 2000). One "hallmark of frontal lobe dysfunction is difficulty in making decisions that are in the long term best interests of the patient." See Antonio R. Damasio & Steven W. Anderson, The Frontal Lobes, in Clinical Neuropsychology 404, 434 (Kenneth M. Heilman & Edward Valenstein eds. 4th ed. 2003). "Neurodevelopmental MRI studies indicate this executive area of the brain is one of the last parts of the brain to reach maturity." See Gogtay, supra, at 8177; see also Steinberg, You and Your Adolescent: The Essential Guide for Ages 10-25, 116 (Rev. ed 2011) ("Imaging studies show that the brain is stull maturing well into the mid-20s, especially regions responsible for regulating emotions, controlling impulses, and balancing risk and reward.")

There are two ways in which the adolescent's prefrontal cortex is physically underdeveloped, affecting brain functioning: pruning and myelination. See Graham AMA Brief at 18-19. Pruning refers to the process of decreasing gray matter in the brain as it matures. Id at 19 ("[P]runing of excess meurons and connections which make up the gray matter leads to greater efficiency of neural processing and strengthens the brain's ability to reason and consistently exercise good judgment. Thus, pruning establishes some pathways and extinguishes others, enhancing overall brain functions."). MRI technology has allowed for a better understanding of the pruning process and its impact on brain maturation.

> Gray matter volumes peak during the ages from 10-20 years, and the
> prefrontal cortex is one of the places where gray matter increases
> before adolescence and then gets pruned over time, beyond adolescence.
> The prefrontal cortex is also one of the last regions where pruning
> is complete and this region continues to thin past adolescence.
> Graham AMA Brief at 20-21. Pruning is one measure of brain maturity.
> One of the last regions of the brain to reach full maturity in
> the pruning process is the pre-frontal cortex, "the region more
> closely associated with risk assessment, impulse control, emotional
> regulation, decision making, and planning..." Id at 21.

During adolescence, "white matter" in the brain increases by a process called "myelination." See Roper APA Brief at *11. "The presence of myelin makes communication between different parts of the brain faster and more reliable." See Alkhonon Goldberg, The Executive Brain: Frontal Lobes and the Civilized Mind 144 (2001). The increase in "white matter" or myelination "continues through adolescence into adulthood." See Graham AMA Brief at 22 n. 68. "A longitudinal MRI study at the National Institute of Mental Health documented an increase in white matter continuing through the teenage years to at least age 22." Roper APA Brief at 11 (citing Jay N. Giedd et al., Brain Development During Childhood and Adolescences: A Longitudinal MRI Study, 2 Nature Neurosci. 861, 861-862 (1999)).

"Late maturation of the frontal lobes is also consistent with electroencephalogram (EEG) research showing that the frontal executive region matures from ages 17–21 after maturation appears to cease in other brain regions." Roper APA Brief at *12, (citing William J Hudspeth & Karl H. Pribram, Psychophysiology 19, 26–27 (1992)); see also, Mark Hanson, What's the Matter With Kids Today, ABA Joural July 2010, at 50 (discussing scientific research that suggests psychological development continues into early adulthood resulting in shortsighted decisions, poor impulse control, and increased nulnerability to peer pressure during adolescence); Richard Knox, The Teen Brain: It's Just Not Grown Up Yet, Nat'l Pub. Radio (March 1, 2010), interview of Harvard University scientists and expert on epilepsy, Frances Jensen)  ("recent studies show that neural insulation [which connects the frontal lobes to the rest of the brain] isn't complete until the mid-20's."); but cf. Michael S. Gazzangia, Neuroscience in the Courtroom, Sci. Amer. 54, 59 (Apr. 2011) (noting one study using "a technology called diffusion tensor imaging to examine the tracts of white matter that connect different control regions of the cortex in 91 teenage subjects" finding that "juveniles who engaged in risky behavior had tracts that looked more adult than did those of their more risk-averse peers")(emphasis in original).

In addition to structural immaturities, developmental neuroimaging studies show a relationship between the maturation of regions of the brain associated with "Voluntary behavior control" and changes in how the brain functions.  See Graham AMA Brief at 25 (citing Amy L. Krain et al AnfMRI Examination of Developmental Differences in Neural Correlates to Uncertainty and Decision Making, 47:10 J. Child Psychol. & Psychiatry 1023, 1024 (2006).  "Studies show that the socioemotional system, which is responsible for motivating risky and reward based behavior, develops earlier than the cognitive control system, which regulates such behavior... The result is that adolescents experiencing increased motivation for risky and reward-seeking behavior without a corresonding increase in the ability to self-regulate behavior." Graham AMA Brief at 26.  Several parts of the brain including the amygdala and nucleous accumbens reveal this early development of the socioemotional system in adolescents.  Id at 26-27.

Adolescence is a period marked by great change, both physiologically and emotionally.  The adolescent brain is structurally immature and continues to develop well into the twenties.  In addition, adoelscents' socioemotional system develops earlier than the system responsible for cognitive control and executive functions creating a conflict between reward-seeking behavior and self-regulating behavior.

[Adolescent behavior is characterized by a hyperactive reward-driven system (involving the nucleus accumbens), a limited harm-avoidance system (involving the amygdala), and an immature cognitive control system (involving the prefrontal cortex).  As a result, adolescent behavior is more likely to be impulsive and motivated by the possibility of reward, with less self-regulation and effective risk assessment. See Graham AMA Brief at 30.

Recognized research demonstrates that adolescents as a group are less capable of controlling their impulses, regulating their behavior, and managing influences such as peer pressure than adults.  As a result they are less capable of making rational and informed decisions in their own interest than are adults.  This distinction must be apart of the proportionality calculus.  See Part III B. v.a. Supra.  Self regulating behavior and control continue to develop throughout adolescence and early adulthood.  It would not be appropriate to impose a mandatory five-year sentence of incarceration upon a "grossly naive and immature" young adult.

The defendant Sonny Szeto was sentenced on March 6, 2007 before the Honorable Janet C. Hall, United States District Court Judge. Having pled guilty on June 26, 2006 before the Honorable Peter C. Dorsey, Senior United States District Judge on two counts in violation of Title 18, United States Code, Section 2422(b), (interstate travel to engage in illicit sexual conduct, and Title 18 United States Code, Section 2252(A)(5) (possession of child pornography).

Mr. Szeto was subsequently sentenced to 168 months (14 years) and 120 months (10 years) respectively. A sentence at the bottom of the guideline range.

In United States of America v C.R., the Honorable Jack B. Weinstein, Senior United States District Judge, sentenced the defedant on May 16, 2011, after he pled guilty in violation of Title 18, United States Code, Section 2252(b)(1) (Distribution of child pornography). After extensive research the defendant was sentenced to 30 months (2 and one half years). Though this guideline calculation byt he probation department was 168 to 210 months, the same as Sonny Szeto.

And though at first blush the two cases above appear dissimilar, the charging decisions by the prosecutors played a significant role in the guideline calculations. A more detailed examination of the "Totality of Circumstances" and the relative conduct leads more credance to their similarities.

Offense Conduct of Sonny Szeto – (as summarized from the government's Sentencing Memorandum, March 1, 2007).

Through MySpace, in mid September, 2005, an eleven year old girl was contacted by the defendant. Their electronic communication continued eventually on America Online Instant Messenger and during the course of their dialogues activated their webcams followed by communications via cellphone.

In early October 2005 there were face to face encounters between the defendant and the girl. During one of those meetings the defendant kissed the girl. On the second encounter it is alleged the defendant placed his hands under her shirt and fondled her breasts and put his hand inside the girl's pants and fondled

her genitalia.

Following the defendant's arrest, the defendant's housemate contacted the government and stated the defendant had a laptop and other computer equipment in his apartment in New York.

Once seized, the computer was searched and child pornography was discovered.

In United States v C.R., the charged conduct does not accurately reflect the extensive deviant sexual history of the defendant. Several instances of overt acts were taken into consideration but did not impact the guidelines calculation. (As quoted from Lexis/Nexus 53497)

At age fifteen about the time his father and stepmother's connubial relationship was severed, C.R. began smoking marijuana and drinking alcohol. One year later a friend introduced him to child pornography on the internet, and began watching the material with male and female peers. See PSR at 26, 68, 79, 80. Drug use increased markedly over the next few years. See Id at 79-84. By age eighteen, C.R. smoked marijuana "most waking hours". PSR at 79. In addition, he started abusing prescription medications, including anti depressants, sleeping pills, and narcotic painkillers; and he ingested Ecstasy, LSD, and hallucinogenic mushrooms. Id at 81. For three years before he started looking at child pornography on his computer, C.R. spent hours each week downloading and viewing adult pornography, which he encountered for the first time when he saw it online at age thirteen. Id at 68.

Over the next three years the defendant collected more than a thousand pornographic still images and over a hundred such videos, in addition to substantial adult pornography. See Id at 68. Prepubescent and pubescent boys and girls, mainly between ages of ten and seventeen were shown engaged in sexually explicit activities with each other and with adult males. See Id at 9.

C.R. describes viewing child pornography out of curiosity and looking at the images and videos of prepubescents for purposes of sexual gratification. Id at 68. His downloading of child pornography only appears to have occurred when he was high on drugs. Id at 26.

**Sexual History:**

The defendant is unmarried, has no children, is not dating and has never maintained a long term romantic association. See Id at 57. His longest intimate relationship lasted three months, with a girlfriend of his own age. See Id at 68.

Defendant's first over sexual encounter involved physical contact with his paternal half sister then eight years old when he was fifteen. Id at 11. see Id at 68. The incident occurred during a family

vacation and involved touching of sexual organs. Id at 11. see Id at 6. The father with custody of his son and a temporary visit from his daughter had placed the children in the same bed in a hotel room. Id at 11.

Revealed during plea negotiations were two other incidents between these two children. One involved mutual touching when C.R. was sixteen and his half-sister was nine., Id at 1. The other entailed oral-genital contact when she was eleven; he was eighteen and hom from college. See Id at 14. She is not thirteen years old and he is twenty one. See Id at 51.

The defendant's half-sister now resides with her mother, the defendant's former stepmother. Id at 51. At this parent's request, a protective other barring contact between the half-siblings was entered by New York State family court. see Id at 21, 61. No criminal charges were based upon the incidents. The mother of the half-sister "had no prior impression of any possible abuse of [the daughter], and she did not think that the defendant had any sexual or emotional problems until they were revealed during the present criminal prosecution.

C.R. describes having limited sexual encounters with peer males from the time he was sixteen through nineteen years. Id at 68. Between ages seventeen and eighteen, he interacted in a sexual way with adults online, on occasion using a web camera. Id. At age nineteen, he had face-to-face sexual interactions with a forty-year-old man after meeting him online.

The defendant denies meeting with children online, in a sexual manner or otherwise. Id at 68.

First coitus occured when the defendant and a peer female were eighteen. Id.

A history of engaging in sexual relations with individuals two to four years his junion was revealed. Sexual activity included mutual touching with a fifteen year old boy, mutual touching and oral contact with a fifteen year old female, and mutual touching with a sixteen year old female. Id. These incidents occured when C.R. was eighteen and nineteen. See Id 12.

The defendant's sexual orientation appears to still be developing. It has been evaluated as "fluid" and "malleable". Id at 67, 73.

**Instant Offense:**

The offense for which C.R. is being prosecuted occurred when he was living for a short time with his biological mother while attending community college in Queens, New York. See Id at 71. She had met a man thirteen years her junior at an addiction recovery program; they married. Id at 50. The couple had a daughter, now six years old. Id at 50. Household dynamics were turbulent

Id at 71. The biological mother and C.R. had a difficult relationship, and he never developed a closeness with his stepfather. Id. To avoid confrontations C.R. would return home from school later at night after everyone was asleep. See Id. at 71, 81. High on marijuana and, occasionally other drugs, he would download and view child pornography on a computer in the living room where he slept. Id at 26, 71.

Even in a retribute system, the harm C.R. caused society was greater. Besides receipt of pornography, he admitted to multiple "serial acts" with his sister, who was seven years younger, and with several others. Many of these incidents after he attained the age of eighteen.

Sonny Szeto's acts, according to the government, never went beyong a one time touching of the breasts and genitals, whereas C.R. admitted to several contacts that included oral sex.

<u>Chapman v United States</u>, 500 US 453, 465, 111 S.Ct. 1919, 114 L. Ed 2d 524 (1991)

(Emphasis Added).

> "[A] person who has been convited is eligible for an the
> Court may impose, whatever punishment is authorized by
> statute for his offense, so long as that penalty is not
> cruel and unusual punishment and so long as the penalty
> is not based on an arbitrary distinction that would violate
> the Due Process Clause of the Fifth Amendment." Penal
> distinctions based on the differences in voluntary conduct
> are subject only to rational base scrutiny. However,
> in the sentencing context, Equal Protection and Due Process
> analysis are identical. An argument based on equal protection
> essentially duplicated an argument based on Due Process.
> Equal protection principles are binding on the Federal
> government through the Fifth Amendments Due Process Clause.

> Reduction of "unwarranted sentencing disparities" was
> a - probably the - goal of the Sentencing Reform Act
> of 1984. (Ilene H. Nagal, and Stephen J Selfulhafer,
> 1992, "A Tale of Three Cities: an empirical study of
> charging and bargaining practices under the Federal
> Sentencing Guidelines." Southern California Law Review
> 66:501); see also (Title 28 USC Section 991(b)(a)(B)('the
> purpose of the United States Sentencing Commission are
> to provide certainty and fariness in meeting the purpose
> of sentencing, avoiding unwarranted disparities among
> defendants with similar records who have been found guilty
> of similar criminal conduct while maintaining sufficent
> flexibility to permit individualized sentences when warranted...")).

However, successful challenges to this system; <u>Apprendi v.</u>

<u>New Jersey</u>, 530 US 466 (2000), <u>Blachley v. Washington</u>, 124 S. Ct.

2531 (2004) and <u>United States v. Booker</u>, 125 S. Ct. 738 (2005)

(holdingguidelines are "advisory")) have negated the principles of sentencing

uniformity. We now use a system that allows the Court to disregard the guidelines

completely and use its discretion, or hold to the Sentencing Commission recomendations.

With very few restrictions, the problem with the disparity in sentencing decisions

by different Judges has again come into question.

Though the Second Circuit has taken the view that the Sentencing Court

has no requirement to consider disparity between defendants with similar records

and have been found guilty of similar conduct, "see also; <u>United States V. Irving</u>,

554 F. 3d 64, 75-76 (2d Cir 2009) (district Court was not required to consider Sentencing Commission's statistical information on average sentences for the type of crime) ("Average sentences that provide no details underlying the sentence are unreliable to determine unwarranted disparity because they do not reflect the enhancements or adjustment for the aggravating or mitigating factors that distinguish individual cases." (Quoting United States v. Willingham, 497 F.3d 541, 544 (5th Cir. 2007), it is not only the characteristics of the offender and circumstances of the offense that need to be evaluated, but the process whereby these sentencing decisions were rendered. Objectively examining in depth, the process utilized by the Sentencing Court, among the subjective factors of particular Judge's characteristics and beliefs. And it is here, that the contracts in procedure that are so stark between the case of Sonny Szeto and C.R. that they rise to a violation of Mr. Szeto's constitutional rights under the Fifth Amendment.

Due Process

Procedural Due Process involves basic procedural rights guaranteed every citizen when the government seeks to deprive an individual of his property, freedom or life. This means the government has to employ fundamentally fair procedures in order to restrict or remove the property, freedom or life of any citizen.

In the introduction to the guidelines manual, after alluding to the "just desert" and the general deterrence approaches to punishment, the Commission explained that it had found it difficult to choose between the two and thus simply had decided not to decide which approach should prevail, either generally or with respect to increasing severe sentences tent to cause more harm to society.

Proponents of the therapeutic model think the offenders as "bad apples" and suffering from psychological disorders. In the view, curing such disorders requires psychiatric or psychological therapy. Thus they contend that the punishment model should be replaced by a therapeutic model where the responsibility of

government should be to insure these lawbreakers are cured.

Additionally, those who advance this approach believe punishment tends to add to social misery by reinforcing the criminal tendencies of the person punished.  In response to the harm society inflicts on the offender, the offender's hatred of society grows.  Moreoever while being punished, a first time convict (as in the case of Sonny Szeto) exposed to other offenders, (some with the same untreated despicable traits reinforced).  Recent scientific evidence supports this conclusion.

## EQUAL PROTECTION

"Any social problem that exists at the intersection of adolescence, sex, technology, and criminal law compels strong reaction from all sides... it often results in sensationalism and oversimplification of multifacted issues making it more difficult to discuss the problem rationally and productively." Mary G. Leary, Sexting or Self-Producted Child Pornography? The Dialogue Continues – Structured Prosecutorial Discretion Within a Multidisciplinary Response.  IT Va. J.Soc. Pol'y and L. 486, 487-88 (2010).

The Equal Protection Clause of the Fourteenth Amendment requires States to treat "similarly situated" people alike.  It prohibits a State from denying any person within its jurisdiction the equal protections of the law.  The Fifth Amendment extends this protection to actions taken by the Federal government under the Equal Protection component of the Due Process Clause.

One of the greatest difficulties in a claim of violation of rights under the Equal Protection Clause is the tendency of the Courts to allow seemingly discriminatory actions based on "rational basis" analysis.  However, as stated above, it is difficult at best, to discuss this offense in light of the confluence of psychological, moral and victim issues.

"Similarly situated" is not well defined.  As one Court stated: "Whether two groups of person are similarly situated is not easily ascertained." The

test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protaginists similarly situated... [T]he relevant aspects are those factual elements which determine whether reasoned analogy supports, or demands, a like result.  Exact correlation is neither likely nor necessary..." (Dupont v. Commissioner of Corrections, 448 Mass. 389, 400, 861, NE 2d 744 (2007) (Citation Omimitted)).

A low rational based hurdle has been consistently applied by COurts addressing Due Process or Equal Protection challenges to Congressionally prescribed sentences. See, e.g., United States v. Byrd, 379 Fed app'x 84 (2d Cir 2010) (upholding mandatory minimum sentence for use of a firearm in furtherance of a crime or violence).

But it is not the rationality of the mandatory minimum sentence that we are challenging here (Mr. Szeto's offense carried a five year minimum). For those have repeatedly been rejected; see, e.g. United States v MacEwan, 445 F.3d at 252-53; United States v Walker, 473 F.ed 71, 76 (3d Cir 2007) (Considering mandatory minimum sentence for firearms offenses, and a generalizing holding of MacEwan to specific crimes.  The brief treatment of the subject in the guidelines manual with the improbably assertion that "[a]s a practical matter in most sentencing decisions both philosophies may prove consistent with the same result." (see USSG Section 1A3).

While it is true the the sentencing commission did not settle on a particular principle of dealing with offenders, some portions seem clearly based upon the principle of retribution to the exclusion of others.  The long sentence and enhancements of sex offenders reflects the need for retribution.  THe guidelines are structured to ensure that every unit of additional harm is met with an additional unit of punishment, (USSC 1991a, 288, 292, 296, 299) and thus reflect the principle of retribution.

This model is based on the principle that society should pay back lawbreakers

by taking vengeance with harm for harm for what they have inflicted. It does not necessarily ask whether the individual against whom revenge is sought has an excuse or justification for the harm he inflicted, nor does it distinguish between accidental and intentional harm. Vengeance per se only knows that harm was done and only wants to repay the one who did it by harming him or her in return.

This was the process Sonny Szeto was subjected to.

In the case of C.R. Senior Judge Weinstein utilized a process that emphasized the long term effects of his sentencing decision in both terms of society's needs and for the rehabilitation of the defendant to become one again a productive member of society, something completely ignored by the guidelines system.

Modern critics think punishment and prolonged incarceration are not the answer to criminal behavior. And that in the long run reject all "challenges to mandatory sentencing schemes on the ground that there is no Due Process right to individual sentencing").

## Rationality

It is the Constitutional rationality of how a different procedure brought about a vastly different sentence with similar elements.

In ne hemmler, 136 US 436, 448-49, 10 S.Ct. 930, 34 L.Fd 519 (1890) ("Undoubtly the [fourteenth] amendment forbids any arbitrary deprivation of life, liberty, or property, and secures equal protection to all under like circumstances in the enjoyment of their rights; and, in the administration of criminal justice, requires that no different or higher punishment shall be imposed upon one than is imposed on all like offenses.")

In United States v Trimble, 487 F. 3d 752, 754, 757 (9th Cir 2007), the defendant complained that she had been assessed a processing fee of $25.00 because one officer began using a new ticketing form before others on the same day, and therefore was unfairly subject to the fee when others were not.

The Court analyzed the governing rationality standard, and explained that the imposed penalty must stand "if we can imagine any rational reason for the Judge to treat [the defendant] differently because she received a traffic ticket on a new form as opposed to the old one." Trimble, 487 F 3d at 754. It found that the new form did not clearly apply, even by its terms, to the defendant, and held that assessing the $25.00 processing fee for some violations but not for others for the same offense was arbitrary and irrational:

[T]here is no rational, non-arbitrary reason for the new form/old form distinction as applied to petty offenders. As applied to Trimble, new form/old form is no better a distinction than between Wednesday/Friday or odd/even. We conclude, consequently that the Magistrate Judge violated Trimble's Constitutional rights by charging her more than other petty offenses..." Trimble, 487 F 3d at 757.

# CRUEL AND UNUSUAL PUNISHMENT

To determine whether a punishment is Constitutionally Cruel and Unusual, "Courts must look beyond historical concepts to 'the evolving standards of decency that mark the progress of a mature society.'" Graham v Florida, 130 S.Ct. 2011, 2021, 176 L. Ed 825 (quoting Estelle v Gamble, 429 US 97, 102 97 S.Ct. 285 50 L.Ed 2d 251 (1976).

Sonny Szeto's 168 month (fourteen year) sentence is Cruel and Unusual in that "A sentence lacking a legitimate justification by its nature is disproportionate to the offense" and therefore, unconstitutional under the Eighth Amendment. Graham, 130 S. Ct. at 2028. Neither "retribution," "deterrance," "nor rehabilitation," Id. at 2028-2029, justifies a fourteen year sentence.

As of the date of this brief Sonny Szeto has been in Federal custody over five and one half years at Allenwood Low Correctional Facility in White Deer, Pennsylvania. To date he has never been evaluated or begun any type of treatment similar to that he had been taking advantage of presentence.

In C.R. (Hr'g Tr 169, Jan 26, 2011 (testimony of DA Kaplan)) it states; "the earlier you begin treatment the earlier these patients are not ingrained and the earlier you can shift them over, move them on concentrating consenting sex with peers."

In Sonny Szeto's case, according to BOP policy he will not be eligible for any formal Sex Offender Treatment until he is 36 months from his release date. The urgency that he receive beneficial treatment had come to an abrupt halt, when he came into BOP custody, so the goal of rehabilitation has failed.

In Mr. Szeto's sentencing transcript (pg 49-50), the father of the girl involved voiced a concern that he did not want Mr. Szeto to receive the mandatory minimum because his daughter would still be a minor in high school. (Sent. Trans. Pg 50; "I would argue that she at least have a chance to date, get on well in college or early adulthood before the defendant is released").

The girl is not the age of majority and Mr. Szeto will no longer be a treat to her. The reasoning why Mr. Szeto will serve yet another six (6) more years has no penological goal.

To allow Mr. Szeto the opportunity to continue Sex Offender Treatment in the community and have him become a productive member of society can by the only path that is logical. Subjecting him to a lifetime of supervision the community will meet the ends of society and the defendant as well.

| Sonny Szeto | C.R. |
|---|---|

Origianl Guideline Sentence Range
Computation by Probation Dept. (months):

| | |
|---|---|
| 168-210 (2242B)<br>78-97 (2252A(5)(b) | 168-210 (2252A(2) |

Age at time of offense:

| | |
|---|---|
| 22 | 21 |

Physical Appearance:

| | |
|---|---|
| "..who appears very boyish<br>and immature for his age."<br>(Dr. Goldstein) | "slight with facial<br>appearance of someone in<br>his mid teens"<br>(Judge Weinstein) |

Deportment:

| | |
|---|---|
| "Low self esteem"<br>(Dr. Goldstein report) | "Poor self esteem"<br>(Dr. Prently report) |

Childhood Atmosphere:

| | |
|---|---|
| mother chronic alcoholic,<br>attacked Sonny with knife,<br>suicidal in from of son<br>(Sonny) | mother cocaine addict,<br>absent. taught son,<br>nuisance things. |

Alleged Sex Acts with Minors:

| | |
|---|---|
| one instance<br>hands on breasts and<br>genitals | mutual sex acts, including<br>oral sex with both genders<br>and half sister<br>(admitted by defendant) |

Presentence Behavior:

| | |
|---|---|
| No violations<br>eventually ankle bracelet<br>monitoring ordered removed | Multiple bail violations<br>eventually GPS monitoring<br>ordered |

Substance Abuse:

| | |
|---|---|
| Alcohol | marijuana, alcohol, LSD,<br>Ecstasy, sleeping pills,<br>narcotic pain killers<br>hallucinogenic mushrooms |

Sentence by Court:

| | |
|---|---|
| 168 months (2242(b))<br>Guideline Sentence<br>120 Months (2252A(5)(b)<br>Statutory Maximum<br>Months above upper guideline range<br>Concurrent | 30 months (2252A(2))<br>Below mandatory minimum of<br>of 60 months |

Sonny Szeto was, at the time of the offense, one (1) year older than the defendant in C.R. as evidenced by comparing psychological reports on the defendant, similarities are very evident.  However, also striking contrasts will show Mr. Szeto's was less egregious than the defendant in C.R.

CONCLUSION

Congress established the United States Sentencing Commission in 1984 with the goals of 1.) establishing "sentencing policies and practices" that (A) assure the meeting of the purpose of sentencing as set forth in [18 USC Section 3553(a)(2)]: (B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities..., and (C) reflect, to the extent practicable, advancement in the knowledge of human behavior as it relates to the criminal justice process;" and 2.) developing "means of measuring the degree to which sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing." 28 USC 991(b).

Since United States v. Booker, 543 US 220, 245, 125 S.Ct. 738, 16 L. Ed 2d 621 (2005) (making the guidelines "advisory") which effectively ended mandatory sentencing under the guidelines, much of the progress in evaluating the personal charachteristics of the defendant and how they may have played a part in the offense has fallen on the District Court.

Sex offenses and unique among other crimes in that in most cases, there almost always seems to be a psychological illness component. Though prosecutors try to diminish its role during sentencing a defendant, on the other side, they are adament about supervised release conditions that require an offender to attend sex offender treatment and limit their personal liberties. All in the interest of that treatment.

If the government requires this treatment, and the restrictions placed on a a sex offender at the end of incarceration, then they are admitting that this is indeed a treatable mental illness. The question therefore is; why are Courts incarcerating scores of sex offenders as, in the case of Sonny Szeto, fourteen years? Has mental illness become a crime?

Under 28 USC Section 991(b), two provisions apply in the context of Sonny Szeto; (1)(c), which states: "relect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."

Much has been learned since Sonny Szeto was sentenced by this Court as we brought forth earlier. Learned jurists are utilizing these "advancements" to better balance the factors set forth in 3553(a)(2). Judge Dorsey even in 2006 acknowledged to Attorney Stavis "Judge Dorsey indicated to us in his chambers that warehousing people with Mr. Szeto's <u>illness</u> is not the answer and that therapy is the answer." (Sent. trans. pg 40, 19-21)

In fact, Mr. Szeto was, on his own volition traveling 5 hours one way to therapy once a week for months prior to his sentencing in 2006. Since that time however, he has not been given the opportunity for any further counseling. He essentially, as Judge Dorsey had feared, been "warehoused" for over five and one half years at Allenwood Low Security Correctional Institution.

Recent events in this country have now brought to the forefront what apathy recognizing and treating mental illness has done. We have seen it in violent actions in schools, theaters, and malls. We also see it in our soldiers returning from war. Many veterans whose mental scars have led them to be imprisoned as well.

And the victimes of this are not just limited to whom the mentally ill act out against, but also extend to family, friends and loved ones of that person. They too have to live with the consequences of the actions which at times means leaving children without the support of that parent for extended periods of time and therefore allowing the potential of a repeating pattern to develop.

The governments's stance has been in most cases, plain denial that the problem exists. And that treatment would not change anything. Essentially burying their heads in the sand, when experts in the field are shouting at them there is a solution. Only taking their heads out to punish, and then bury the problem in our nation's prisons without attempting to correct the cause. This does not solve the problem, it only delays it to a later time.

Which brings the second part of 991(b) into better context. (2) developing "means of measuring the degree to which sentencing, penal and correctional practices are effective in meeting the purposes of sentencing."

Keeping in mind 991(b) was promulgated in the 1980's and was designed for a determinate sentencing structure, that at the time rarely dealt with sex offenders and the internet. It may fall upon the District Court to weigh these factors appropriately in the context of what advancements have been made and what is the best course for the offender and society.

Where does this all lead us? Legally, Sonny Szeto was not subject to the same Due Process and the defendant in C.R. He was not provided equal protection under the law as C.R., even though Mr. Szeto was also diagnosed with a similar psychological profile. Sonny Szeto's sentence serves no penological purpose other than to lock away as possible an individual with a mental illness. A treatable mental illness, for which he has shown in the past welcome therapy. This makes his punishment Cruel and Unusual considering the circumstances.

When the Court's goal at the onset is rehabilitation of the defendant as well as society's need for retribution, and in the case of Sonny Szeto, a Court that has a goal of only the degree of punishment needed, exclusively, the process is unfair; unequal and unconstitutional.

Since November of 1987, the government has attempted to utilize the sentencing guidelines to categorize, codify and punish crimes equally, without regard to characteristics that make us unique individuals. This becomes further magnified when it comes to criminalizing how people think, or look at someone, or act. Much has been learned by experts why people make act a certain way. And after a complete evaluation, if it is something that society will not accept, a way to correct that.

Sonny Szeto has spent over five and one half years in a Federal prison that offers no programs for his illness. He has indeed been warehoused. With

many more years left to complete, this additional time is unnecessary, and is recognized in the Supreme Court case of <u>Tapia v United States</u>, US, No 10-5400 Justice Roberts said, "once this Court makes clear that imprisonment is not an appropriate means of promoting rehabilitation [and] therefore, Courts cannot impose or lengthen a term of imprisonment to serve that purpose, sentencing Courts will follow that map."

Does this Court want Sonny Szeto to be rehabilitated? Rehabilitation is something that experts agree would best be accomplished in a community setting. For a young man already traumatized and confused because of his childhood experiences, does not prison exacerbate those issues in a young man like Sonny Szeto?

We would respectfully request that the Court hold a Fatico hearing (<u>United States v Fatico</u> 603 F. 2d 1053 (2nd Cir 1979)) so that Mr. Szeto can be afforded the same Due Process afforded <u>C.R.</u> Allowing a complete picture to emerge that will benefit not just Mr. Szeto, but society as well.

For the reasons set forth above, the petitioner respectfully prays this Court to set aside the judgment of the petitioner's last judgment and accept the new evidence contained here.

Respectfully Submitted,

Sonny Szeto
Reg. No. 16365-014
Low Security Correctional
Institution - Allenwood
P.O. Box 1000
White Deer, PA 17887

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this brief and all

attachments are being furnished by United States mail, First-Class postage to:


      Clerks of the Court
      915 Lafayette Blvd.
      Bridgeport, CT 06604


I certify that this document was given to prison officials on 2/5/2013

for forwarding to the District Court. I certify under penalty of perjury that

the foregoing is true and correct. 28 USC §1746


      Sonny Szeto
      Reg. No. 16365-014
      Low Security Correctional Institution
      Allenwood
      P.O. Box 1000
      White Deer, PA 17887


Dated: 2/5/2013